# RECORD NO. 12-1926

In The

# United States Court Of Appeals
## For The Fourth Circuit

# DENNIS HAGY; TAMERA HAGY,

*Plaintiffs - Appellants,*

and

## DUSTIN HAGY; CLARK HAGY,

*Plaintiffs,*

v.

# EQUITABLE PRODUCTION CO.;
# BJ SERVICES COMPANY, USA,

*Defendants - Appellees,*

and

## HALLIBURTON ENERGY SERVICES, INC.; WARREN DRILLING COMPANY, INC.,

*Defendants.*

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA AT CHARLESTON

———————————

## BRIEF OF APPELLANTS

———————————

**Kevin W. Thompson**
**David R. Barney, Jr.**
**THOMPSON BARNEY**
**2030 Kanawha Boulevard, East**
**Charleston, WV  25311**
**(304) 343-4401**

*Counsel for Appellants*

*Gibson*Moore Appellate Services, LLC
421 East Franklin Street  ♦  Suite 230  ♦  Richmond, VA  23219
804-249-7770  ♦  www.gibsonmoore.net

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. _____        Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____
(name of party/amicus)

_____

who is _____, makes the following disclosure:
      (appellant/appellee/amicus)


1.      Is party/amicus a publicly held corporation or other publicly held entity?      YES      NO


2.      Does party/amicus have any parent corporations?                          YES      NO
        If yes, identify all parent corporations, including grandparent and great-grandparent corporations:




3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                    YES      NO
        If yes, identify all such owners:

- 1 -

4.     Is there any other publicly held corporation or other publicly held entity that has a direct
       financial interest in the outcome of the litigation (Local Rule 26.1(b))?     YES     NO
       If yes, identify entity and nature of interest:

5.     Is party a trade association? (amici curiae do not complete this question)     YES     NO
       If yes, identify any publicly held member whose stock or equity value could be affected
       substantially by the outcome of the proceeding or whose claims the trade association is
       pursuing in a representative capacity, or state that there is no such member:

6.     Does this case arise out of a bankruptcy proceeding?                          YES     NO
       If yes, identify any trustee and the members of any creditors' committee:

Signature: _____      Date: _____

Counsel for: _____

# CERTIFICATE OF SERVICE
**************************

I certify that on _____ the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

_____           _____
       (signature)                                      (date)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................. iii

JURISDICTIONAL STATEMENT .................................................................1

STATEMENT OF THE ISSUES.......................................................................2

STATEMENT OF THE CASE..........................................................................2

STATEMENT OF FACTS ................................................................................3

SUMMARY OF THE ARGUMENT ................................................................6

ARGUMENT .....................................................................................................6

    I.      THE DISTRICT COURT ERRED WHEN IT GRANTED SUMMARY JUDGMENT IN FAVOR OF THE BJ SERVICES AND EQT.......................................................................6

        A.    Standard of Review....................................................................6

        B.    Discussion of the Issues .............................................................8

                1.    Genuine Issues of Material Facts Exist Regarding the Hagys' NEGLIGENCE Cause of Action Against BJ Services; Thus, Summary Judgment is Not Appropriate ................................................................9

                        a.    Failure to Maintain Proper Cement Density ........11

                        b.    Failure to Hold Pressure and Properly Place Packers.................................................................13

                        c.    BJ Services Improperly Used Defective Pumps Which Contributed to the Failure to Maintain Pressure ...............................................14

i

d.      The Hagys Can Identify the Specific Harm the They Have Suffered as a Result of BJ Services' Tortious Activity ..................................15

e.      The Hagys Can Demonstrate the Causal Link Between BJ Services' Tortious Conduct and the Hagys' Damages ......................16

   i.      Causation Regarding Property Damage: Pre-Drilling v. Post-Drilling Water Samples and Expert Conclusions/Inferences .............................16

   ii.     Causation Regarding Physical Damages....................................................19

   iii.    Audio-Taped Statements of EQT Representatives ...............................20

2.      Genuine Issues of Material Facts Exist Regarding the Hagys' TRESPASS Cause of Action Against BJ Services; Thus, Summary Judgment is Not Appropriate ...................................................21

3.      Genuine Issues of Material Facts Exist Regarding Whether the Hagys' Claims Against EQT Were Extinguished by Releases; Thus, Summary Judgment is Not Appropriate..........................................22

   a.      Based on documented assurances made by EQT personnel, Dennis and Tamera Hagy's claims have NOT been released ...........................22

CONCLUSION ................................................................28

REQUEST FOR ORAL ARGUMENT ................................................28

SIGNATURE OF COUNSEL ..................................................29

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases:**

*Anderson vs. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)...............................................................................7, 8, 10

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986)..................................................................................7, 10

*Charbonnages de France v. Smith*,
    597 F.2d 406 (4th Cir. 1979) ..........................................................................8

*Dornton v. Darby,*
    373 F.2d 619 (5th Cir. 1967) ..........................................................................9

*Eastman Kodak Co. v. Image Technical Servs., Inc.,*
    504 U.S. 451, 112 S. Ct. 2072, 119 L. Ed. 2d 265 (1992) ...........................10

*Ellis v. Metropolitan Life Ins. Co.,*
    126 F.3d 228 (4th Cir. 1997) ..........................................................................6

*Frusetta v. Hauben*,
    217 Cal. App. 3d 551 (*mod on other gnds*)
    (Cal. App. 2nd Dist. 1990) ....................................................................25, 26

*Hark v. Mountain Fork Lumber Co.*,
    34 S.E.2d 348 (1945).....................................................................................21

*Hughes v. American Jawa, Ltd.,*
    529 F.2d 21 (8th Cir. 1976) ..........................................................................10

*Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,*
    475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) .............................10

*Nelson v. International Paint Co.,*
    734 F.2d 1084 (5th Cir. 1984) .........................................................................9

*News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.,*
    597 F.3d 570 (4th Cir. 2010) ........................................................6

*Overstreet v. Ky. Cent. Life Ins. Co.,*
    950 F.2d 931 (4th Cir. 1991) ........................................................8

*Russell v. Microdyne Corp.,*
    65 F.3d 1229 (4th Cir. 1995) ........................................................8

*Shealy v. Winston,*
    929 F.2d 1009 (4th Cir. 1991) ......................................................7

*Sosebee v. Murphy,*
    797 F.2d 179 (4th Cir. 1986) ........................................................8

*Taylor v. Culloden Public Service Dist.,*
    591 S.E.2d 197 (W. Va. 2003) ..............................................21, 22

*TSC Industries, Inc. v. Northway, Inc.,*
    426 U.S. 438, 96 S. Ct. 2126 48 L. Ed. 2d 757 (1976) .................10

*United States v. Diebold,*
    369 U.S. 654 (1962)......................................................................8

*Vaughn v. Didizian,*
    648 A.2d 38 (Pa. Super. Ct. 1994) ..............................................25

*Williams v. Griffin,*
    952 F.2d 820 (4th Cir. 1991) ........................................................7

**Statutes:**

28 U.S.C. § 1331 ................................................................................1

28 U.S.C. § 1332................................................................................2

**Rule:**

Fed. R. Civ. P. 56(c)..........................................................................6

iv

**Other Authorities:**

3 Blackstone's Commentaries, 209...........................................................................21

10 C. Wright & A. Miller,
*Federal Practice and Procedure: Civil*,
    § 2729 (1973)...............................................................................................10

10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane,
*Federal Practice and Procedure: Civ. 3d,*
    § 2729 (1998).......................................................................................... 9-10

# JURISDICTIONAL STATEMENT

This appeal arises from a civil action commenced by Plaintiffs in the underlying action and Appellants herein, Dennis and Tamera Hagy (hereinafter, "the Hagys" or "Appellants"), alleging claims sounding in negligence, trespass and private nuisance against Equitable Production Company (hereinafter, "EQT") and BJ Services USA (hereinafter, "BJ Services") for damages to personal property as well as personal injuries. (Joint Appendix, hereinafter referred to as "JA" p. 49). The United States District Court for the Southern District of West Virginia in Charleston had jurisdiction in the matter of *Dennis Hagy, et al. v. Equitable Production Co., et al*., 2:10-CV-01372, pursuant to 28 U.S.C. § 1331.

On or about March 19, 2012, EQT filed a motion for summary judgment. (JA p. 154) The district court granted the EQT's motion on May 17, 2012 and entered judgment in favor of EQT. (JA p. 2385) On or about March 19, 2012, BJ Services filed a motion for summary judgment. (JA p. 446) The district court granted the BJ Services' motion June 29, 2012 and entered judgment in favor of BJ Services. (JA p. 2498)

On July 30, 2012, the Hagys filed a timely notice of appeal. (JA p. 2513) This Court has jurisdiction to review the district court's final judgment herein.

## STATEMENT OF THE ISSUES

The district court erred in granting summary judgment in favor of BJ Services and EQT, thereby depriving Appellants of their right to a jury trial on the merits of the case.

## STATEMENT OF THE CASE

On October 26, 2010, the Hagys filed suit against the Appellees in the Circuit Court of Jackson County, West Virginia. (JA p.49).  On December 10, 2010, former defendant, Warren Drilling Company, removed the case to the district court on the grounds of complete diversity of the parties pursuant to 28 U.S.C. § 1332.

The parties engaged in the discovery process pursuant to the Federal Rules of Civil Procedure.  At the conclusion thereof, on March 19, 2012, BJ Services and EQT each filed a motion for summary judgment.  (JA p.446 and JA p.154 respectively). The Hagys filed responses to each motion, which was followed by replies by BJ Services and EQT.

On May 17, 2012, the district court entered a Memorandum Opinion and Order which granted the EQT's motion for summary judgment. (JA  p. 2385)  On June 29, 2012, the district court entered a Memorandum Opinion and Order which granted BJ Services' motion for summary judgment.  (JA p. 2498)

The Hagys filed a timely notice of appeal on July 30, 2012.  (JA  p. 2513)

## STATEMENT OF FACTS

The Hagys own property in Romance, West Virginia in Jackson County just north of the Kanawha County border (hereinafter, "the Subject Property"). The Subject Property is not served by municipal water, so the Hagy family relied, since the early 1990s, on a well drilled to a depth of approximately 100 feet.

In late 2007, drilling and completion operations began on the Subject Property. These operations were performed by EQT, BJ Services, Warren Drilling Company, Inc. (hereinafter, "Warren Drilling") and Halliburton Energy Services, Inc. (hereinafter, "Halliburton") (collectively, "Defendants"). By the end of June of 2008, EQT and BJ Services had completed all drilling and completion activities. (JA. p. 1224, 1230-1232, *William Kimbrell Expert Report*.)

The Hagys allege that the Defendants' drilling and completion activities related to a series of four wells permitted by EQT and completed by BJ Services contaminated the Hagys' water well.[1]

Sometime during the month of July 2008, the Hagys began to notice a few particles in their water which they initially attributed to a lack of rain.  (JA. p.

---

[1]     Originally, the underlying suit involved four members of the Hagy family bringing suit against these Defendants.  However, the original plaintiffs reached a settlement with Halliburton and Warren Drilling which enabled the Hagys to fund medical monitoring for the Hagys' sons, Dustin and Hagy.  Because their demands have been substantially met by Halliburton and Warren Drilling, the Hagys moved for, and the district court granted, dismissal of the claims of Dustin and Clark Hagy against the two remaining Defendants, BJ Services and EQT.

1267-1269, *Dennis Hagy Deposition at 113/2-9*)  During the subsequent Autumn months, the Hagys' water quality began to seriously degrade to the point that drinking the water burned the throat of former plaintiff, Clark Hagy.  (JA. p. 1270-1273, *Dennis Hagy Deposition at 184/21-185/1*)  Also, the quantity of water available from the well began to decline.  (JA. p. 1274-1278,  *Dennis Hagy deposition at 118/21-120/22*)

The Hagy well had been tested at least twice before the subject drilling began, so when the post-drilling tests were compared to the pre-drilling tests, it was obvious that the drilling and completion activities of BJ Services and EQT had negatively impacted the Hagys' well.  Those tests revealed increased levels of iron and manganese.  Although EQT was well aware of other chemicals in fracking fluids, they only performed tests searching for a very limited number of the chemicals of concern.  . (JA. p. 1279-1283, *Dr. Simonton Expert Report*)

Two EQT landmen admitted that EQT's activities impacted the Hagy well water. Jeremy White, the EQT Landman assigned to the Hagy property, testified in his deposition that there was a difference between pre-drill and post drill water samples and that he admitted that he told Mr. Hagy, "…something we did had something to with it, I am not doubting that fact and I don't think anyone is doubting that." (JA. p. 1378-1380, *Jeremy White Deposition at 45/1-6*)

4

James Robert Evans, an engineer and EQT landman, indicated that the cement should have sealed off.  (JA. p. 1381-1383, *Jim Evans Deposition at 41/12-15*).  The following is a passage from a transcript of conversation between Mr. Hagy and Mr. Evans:

> MR. HAGY: Where did they hit the water that he (regulator) was talking about around my house he said?
>
> Mr. EVANS: See I don't know that. Obviously that's – you know, they're going down this deep. As they're going through they think they might have—but what they done and I'm learning that what they do is when they built through, you know, different seams that hit, you know, water—
>
> MR. HAGY: Right.
>
> MR. EVANS: -- what they do is they go in and they concrete that in, you know, that pipe – the casing that the put in the ground and somehow it should have sealed off and it should not have gotten – you know what I'm saying. So I've overheard a little bit of it, but, you know.

(JA. p. 1403-1404, *Conversation Audiotape Transcript*)

> Mr. Evans went on to say:
>
> MR. EVANS: And then they as supposed to – its's supposed to be cased in concrete so it doesn't seeped out, but I don't know. They don't really know what happened, you know but they definitely saw from the water samples before and the water samples after, it's definitely a problem.

(JA. p. 1406, *Conversation Audiotape Transcript*)

After its own personnel found that the water had been impacted by EQT's operations, EQT provided replacement water to the Hagys and even paid for a hotel room for Dennis and Tamera Hagy. (JA. p. 1375-1377, *Dennis Hagy Deposition at 13/4-7*)

## SUMMARY OF THE ARGUMENT

The district court erred when it granted summary judgment in favor of the BJ Services and EQT. The Hagys maintain, and unequivocally demonstrate below, that genuine issues of material fact abound in this case which should rightfully entitle the Hagys to present their case before a jury of their peers.

## ARGUMENT

**I.     THE DISTRICT COURT ERRED WHEN IT GRANTED SUMMARY JUDGMENT IN FAVOR OF THE BJ SERVICES AND EQT.**

**A.     Standard of Review.**

The district court's grant of summary judgment is reviewed by this Court *de novo*. *News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.,* 597 F.3d 570, 576 (4th Cir. 2010); *Ellis v. Metropolitan Life Ins. Co.,* 126 F.3d 228, 232 (4th Cir. 1997).

The granting of summary judgment is only warranted if the record shows "that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, to prevail on a motion for summary judgment, the moving party must demonstrate that (1)

there is no genuine issue as to any material fact and (2) that it is entitled to summary judgment as a matter of law. *Id.* A fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under applicable law. *Anderson vs. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257.

For summary judgment purposes the Court must view the facts and inferences drawn from the evidence and the record "in the light most favorable to the non-moving party." *Shealy v. Winston*, 929 F.2d 1009, 1011 (4th Cir. 1991). The burden is on the moving party to demonstrate there is no genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the moving party meets this threshold, then the non-moving party must demonstrate that specific, material fact(s) exist, which gives rise to a genuine issue in order to survive the motion for summary judgment. The non-moving party may not merely rely on the allegations set forth in its pleadings. *Id.* A party is not entitled to summary judgment if the record as a whole could lead a rational trier of fact to find in favor of the non-movant. *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991).

In considering a motion for summary judgment, the court will not "weigh the evidence and determine the truth of the matter." *Anderson* 477 U.S. at 249 (1986). If factual issues exist that can only be resolved by a trier of fact because they may reasonably be resolved in favor of either party, summary judgment is inappropriate. *Id*. at 250. Even if there is not dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute. *Overstreet v. Ky. Cent. Life Ins. Co*., 950 F.2d 931, 937 (4th Cir. 1991).

A court must not resolve disputed facts, weigh the evidence or make credibility determinations. *Russell v. Microdyne Corp*., 65 F.3d 1229, 1239 (4th Cir. 1995); *Sosebee v. Murphy*, 797 F.2d 179, 182 (4th Cir. 1986). Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and have all internal conflicts resolved in his or her favor. *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979). Inferences that are "drawn from the underlying facts … must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold*, 369 U.S. 654, 655 (1962).

## B.    Discussion of the Issues

The district court erred by granting summary judgment to BJ Services and EQT. Genuine issues of material facts abound significantly with respect to the Hagys' causes of action of negligence, trespass and nuisance against BJ Services,

in addition to their all of their causes of action against EQT.  As will be demonstrated unequivocally below, summary judgment is inappropriate in the instant matter because the facts relied upon by the Hagys demonstrate that a reasonable fact finder, viewing the entire record and all reasonable inferences drawn therefrom in a light most favorable to the Hagys, could reasonably return a verdict for the Hagys.

      **1.**    **Genuine Issues of Material Facts Exist Regarding the Hagys' NEGLIGENCE Cause of Action Against BJ Services; Thus, Summary Judgment is Not Appropriate.**

It should be initially noted that, historically, summary judgment has not been considered feasible in negligence cases, particularly on the grounds of conclusive proof of the absence of negligence, contributory negligence, or proximate cause. In such cases, the standard of the reasonable person must generally be applied in the context of a full exposition of all the underlying facts and circumstances, and the jury has been accorded particular deference in light of its supposedly unique competence in applying the reasonable person standard to a given fact situation. This concept has been applied even when there is no dispute as to the facts.  *See* 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civ. 3d,* § 2729 (1998), citing, *inter alia, Nelson v. International Paint Co.,* 734 F.2d 1084 (5th Cir. 1984) and *Dornton v. Darby,* 373 F.2d 619, 621 (5th Cir. 1967).

Except in rare cases in which the nonmoving party could not prevail under any discernible circumstances, tort actions generally encompass a multitude of factual issues and abstract concepts that become elusive when applied to varying concrete factual situations, rendering those actions inappropriate for disposition by summary judgment. *Wright, Miller & Kane, supra,* citing *Hughes v. American Jawa, Ltd.,* 529 F.2d 21, 23 (8th Cir. 1976). *See* also, *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 450 n. 12, 96 S. Ct. 2126, 2133, 48 L. Ed. 2d 757 (1976) ("In an analogous context, the jury's unique competence in applying the 'reasonable man' standard is thought ordinarily to preclude summary judgment in negligence cases," citing 10 C. Wright & A. Miller, Federal Practice and Procedure: Civil, § 2729 (1973)).  The Supreme Court's decision in *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 468, 112 S. Ct. 2072, 2083, 119 L. Ed. 2d 265 (1992) may be seen as some verification that this traditional view of summary judgment in tort actions has not been abrogated by the modern view of summary judgment practice set out in the 1986 trilogy, *Celotex Corp. v. Catrett, supra* , *Anderson v. Liberty Lobby, Inc., supra*, and *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).  *See Wright, Miller and Kane, supra*, § 2729.

The Hagys allege that BJ Services, on behalf of EQT, committed tortious conduct by negligently cementing and fracking shale-gas wells on the Hagy property. To support this allegation, the Hagys present the following factual assertions which, in the very least, raise genuine issues of material facts which render summary judgment inappropriate.

BJ Services implemented equipment - cement mixers/pumps, packer systems and fracking pumps - which failed. These equipment failures resulted in conditions which enabled fracking fluids to escape from the well-bore into nearby rock formations and, in turn, into the Hagys' water well. The Hagys have described BJ Services' tortious activity with sufficient particularity to defeat summary judgment.

### a.    Failure to Maintain Proper Cement Density

First, the Hagys demonstrated that BJ Services failed to maintain proper cement density. Cement protects groundwater from toxins that potentially escape the well-bore. Due to its equipment failure, BJ Services failed to properly seal the well-bore with cement before pressurized fracking fluids were pumped into the ground.

To support this assertion, the Hagys cited the testimony of EQT's on-site representative which indicated that BJ Services deviated from the standard of care with respect to maintaining a proper cement density. Roy Lawson, EQT's on-site

manager, indicated on BJ Services' "Quality Improvement" that the job was 1) not pumped as designed/requested 2) products did not satisfy EQT's requirements 3) equipment performance and appearance did not satisfy EQT's requirements.  (JA p.2426, *BJS Quality Improvement Form*)

In a comment attached to a BJ Services "Internal Job Evaluation," the EQT representative noted, "Could not get good density all the way through the job.  We either lost hydraulic pressure, no gauge or supercharger, is going out every time we would get the cement up to weight…"  (JA p.2428, *BJS Internal Job Evaluation*)

BJ Services' corporate representative, Eric Luckey, also concluded the poor cement density was attributed to the failure of BJ Services' "supercharge/mix pump."  (JA p. 1704, Luckey *Deposition at 83/16-22*)

EQT's on-site representative noted in his deposition that it is unusual to find cement density as poor as the density achieved by BJ Services at the Hagy site.

> Q. So in a well that would be drilled today is it common to have the cement density poor?
> …
> A. No.
> Q. What about in December of 2007 was it more common to have poor density?
> …
> A. No.
> Q. So this was unusual to have cement density poor like this; right?
> A. Yes.

(JA p.2430, *Roy Lawson Deposition at 25/22-24*)

12

Thus, the deposition testimony of fact witnesses squarely supports Hagys' assertion that BJ Services' activity deviated from a reasonable standard of care to the extent that it failed to maintain proper cement density. Given that proper cement density is a critical factor to protect groundwater from fracking-related toxins which could potentially escape the well-bore, the aforementioned testimony, in the least, creates genuine issues of material fact with respect to the reasonableness of BJ Services' activity in this respect.

### b.    Failure to Hold Pressure and Properly Place Packers

Packers are devices that stabilize the casing pipe and serve to contain fluids in "frack zones," thereby preventing fracking fluids from rising up the well-bore and potentially escaping to the surface or into the rock formations and aquifers. (JA p.2435, *Luckey Deposition at 97/11-98*) Once again, in a job performance survey, EQT's representative recorded BJ Services' deviation from the standard of care by noting that "pressure did not hold at the annulus." (JA p.2430, *BJ Services Cement Job Report*)

BJ Services' corporate representative, Eric Luckey, offered testimony to corroborate EQT's agent's findings: "That's not standard. You want to see the pressure hold on the annulus." (JA p.1710, *Eric Luckey at 88/15-19*) Mr. Luckey further testified "…that [failure to hold pressure at annulus] indicates a partial set of … that top packer (JA p.1713, *Eric Luckey Deposition at 89/4-6.*

13

Mr. Luckey further testified that, "We most likely wouldn't even treat [frack] a well where the packers weren't properly set." (JA p.2435, *Luckey Deposition at 97/11-98*)

Despite the material fact that BJ Services failed to maintain proper pressure at the annulus which resulted in improperly set packers, BJ Services nevertheless fracked the well.

Given that proper pressure at the annulus and properly set packers are also critical factors to protect groundwater from fracking-related toxins which could potentially escape the well components, the aforementioned testimony, in the least, creates genuine issues of material fact with respect to the reasonableness of BJ Services' activity in this respect. Thus, the Hagys have offered further factual support for their assertion that BJ Services deviated from the standard of care.

### c.  BJ Services Improperly Used Defective Pumps Which Contributed to the Failure to Maintain Pressure.

The Hagys relied upon further factual support to demonstrate that BJ Services deviated from the standard of care. Specifically, the Hagys highlighted facts to support its contention that "old pumps" contributed to BJ Services' failure to maintain pressure in the well during fracking.

EQT's representative noted in a job performance survey that BJ Services was not able to achieve and maintain the necessary pressure with the equipment it brought to the Hagy site. (JA p.2440, *Luckey Deposition at 110/10-14).* (JA

14

p.2442, *BJ Services Quality Improvement Form*  Moreover, BJ Services' corporate representative testified that "…our pumps were older and they would actually go down during the pressure tests." (JA p.1719, *Luckey Deposition at 108/24-25*)

Again, given that the implementation of non-defective equipment is critical to help maintain proper pressure in the well, the aforementioned testimony, in the least, creates genuine issues of material fact with respect to the reasonableness of BJ Services' activity in this respect.  Thus, the Hagys have offered even further factual support for their assertion that BJ Services deviated from the standard of care.

### d. The Hagys Can Identify the Specific Harm the They Have Suffered as a Result of BJ Services' Tortious Activity.

Plaintiffs have suffered both property damages and physical harm as a result of BJ Services' contamination of the Hagys' aquifer.  The frack fluids themselves caused physical damages to the Hagys during the time that they were exposed.  Those same frack fluids mobilized metals (iron, manganese, arsenic and lead) which have rendered the property's water supply unusable to this day.  In turn, the property has been rendered unusable because it is uncontroverted that city water is not available at the Hagy property.

With respect to property damage, Tammy and Dennis Hagy have suffered the full range of property damages as a result of BJ Services' tortious activity, including diminution in value, nuisance and trespass.  Once the water became contaminated,

Dennis and Tammy Hagy could no longer live there, thus completely denying them the right to use and enjoy their property. Further, living with contaminated water and subsequently being forced to move to another home has caused the Hagys' to suffer expense, annoyance, inconvenience and emotional distress.

With respect to physical damages, exposure to the water has caused the Hagys to suffer a constellation of symptoms known to be linked to exposure to fracking fluids. In addition to subjective symptoms, like lethargy, nausea and memory loss, Tammy and Dennis Hagy suffered from objective symptoms as well. Mrs. Hagy was diagnosed by her physician with contact dermatitis. Dennis Hagy's primary care physician diagnosed him with a heart condition, bradycardia, which the Hagys' medical experts linked to exposure to the water. These issues are discussed in detail below.

> **e.    The Hagys Can Demonstrate the Causal Link Between BJ Services' Tortious Conduct and the Hagys' Damages.**
>
> > **i.    Causation Regarding Property Damage: Pre-Drilling v. Post-Drilling Water Samples and Expert Conclusions/Inferences.**

In October 2007, few months before BJ Services began operations at the Hagy site, water samples were taken. After BJ Services completed operations, several more water samples were taken which show an 800% increase in iron and a similar spike in manganese.



(JA p.890, *Simonton Report at 3*)

Fracking fluids are known to mobilize iron and manganese found in rock formations into groundwater. Fracking fluids are also known to mobilize arsenic, lead and radon from rock formations. (JA p.1069, *Dr. King Rebuttal Report at 1 citing "Plan to Study Potential Impacts of Hydraulic Fracturing in Drinking Water Resources"- EPA 2011*) All of these toxins (radon, lead, arsenic, iron and manganese) were found at elevated levels in the post-drilling tests of the Hagy site, compared to pre-drilling samples. (JA p.890, *Dr. Simonton Report at 3*)

The fact that iron, manganese, arsenic and lead mobilized out of rock formation after BJ Services fracked the well proves that metal-mobilizing fracking fluids escaped under high pressure into the rock formations underlying the Hagy property and migrated to the Hagy well. In the very least, these water samples create genuine issues of material facts to support this contention.

During the time of the contamination, neither EQT nor the Department of Environmental Protection tested for the more harmful chemicals known to be in the fracking fluids used at the Hagy site. One of the Hagys' experts, Dr. Simonton did in fact test for such volatile toxins and did find the presence of Bis(2-ethylhexyl)phthalate, an organic contaminant associated with natural gas drilling. (JA p.890-891, *Dr. Simonton Report at 3*)

Thus, the presence of elevated metals combined with the site history and the presence of phthalates all support Hagys' expert opinions that the frack fluids migrated from the well-bore and contaminated the Hagy water well.

Plaintiffs' expert petroleum geologist, Clay Kimbrell, identified that the wrongful acts set forth above had created five potential pathways by which BJ Services' fracking fluid could migrate out of the well-bore and into the Hagy well:

(1) annulus between the 4-1/2" uncemented casing and the open hole;

(2) cement behind the 7" casing in each well and the 9-5/8" casing in each well;

(3) induced fractures of the overburden, and

(4) lateral movement through the formations. (JA p.1227-1228, *Clay Kimbrell Report at page 4, conclusion #8)*

18

## ii.    Causation Regarding Physical Damages

The Hagys disclosed the expert opinions of two well-respected medical school professors establishing specific causation for a constellation of conditions the Hagys suffered.   Additionally, a Ph.D toxicologist also offered an opinion on general causation.  These doctors have compared the BJ Services' Material Safety Data Sheets to the medical records of the Hagy family along with medical literature to causally connect exposure to BJ Services' fracking fluids to the adverse medical conditions exhibited by Tammy and Dennis Hagy.

Plaintiffs' medical toxicologist, Dr. Nelson Avery, prepared a chart linking the adverse health effects identified in BJ Services' MSDS sheet to the constellation of symptoms reported in the Hagy medical records.[2]  (JA p.1775-1776, *Dr. Avery MSDS chart)* These charts show that adverse health effects, both objective and subjective, shown by the Hagys are consistent with adverse health effects expected to be caused by exposure to fracking fluids according to BJ Services' MSDS sheets.

Dennis Hagy's treating physician, Dr. Bacha, diagnosed Mr. Hagy with bradycardia, a slowing heart rate.  (JA p.1956-1958, *Dr. Bacha Deposition at 42:14-44:17).*  Mr. Hagy never experienced bradycardia before the exposure, and after Mr.

---

[2] Conditions alleged by the Hagys to have been caused by exposure fracking contaminated water include nausea, skin conditions, memory loss, fatigue, tremors, bradycardia, ringing ears, headache, metallic taste, anxiety and depression.

Hagy moved away from the property the condition began to subside.  Dr. Bacha, while not a toxicologist, did perform a differential diagnosis analysis and testified that no chronic medical condition or drug reaction could explain Mr. Hagy's bradycardia.  *(JA p.1961-1965 Dr. Bacha Deposition at 90:2-94:17)* The Hagys' medical experts have testified and opined that the bradycardia is related to the exposure.

### iii.    Audio-Taped Statements of EQT Representatives

In addition to the aforementioned expert conclusions and inferences, further material evidence supports the causal link between BJ Services' actions and inactions and the Hagys' damages.  Jim Evans, an engineer and landman with EQT, indicated to Mr. Hagy that the cement did not seal as discussed above.  (JA. p. 1403-1404, *Conversation Audiotape Transcript*)

Furthermore, Jeremy White, EQT's senior landman, with respect to the damage to the Hagys' property, admitted he told Mr. Hagy, "Something we did had something to do with it.  I am not doubting that fact, and I don't think anyone is doubting that." (JA. p. 1378-1380, *Jeremy White Deposition at 45/1-6*)

Thus, in addition to the other elements of negligence, genuine issues of material facts abound to support Hagys' assertion that BJ Services' actions and/or inactions caused the Hagys' damages.

**2.    Genuine Issues of Material Facts Exist Regarding the Hagys' TRESPASS Cause of Action Against BJ Services; Thus, Summary Judgment is Not Appropriate.**

BJ Services' contamination of the Hagys' aquifer with hazardous substances plainly constitutes a trespass. "Trespass is defined in its limited sense as: '* * * an entry on another man's ground without lawful authority, and doing some damage, however inconsiderable, to his real property'." *Hark v. Mountain Fork Lumber Co.*, 34 S.E.2d 348, 352 (1945) (citing 3 Blackstone's Commentaries, 209). The contamination of the Hagys' aquifer and the increase in radon in the Hagys' well water and house related to BJ Services' activities resulted in the Hagys having to move from their property. BJ Services' actions damaged the Hagys' aquifer and interfered with their use of the property.

In *Taylor v. Culloden Public Service Dist.*, 591 S.E.2d 197 (W. Va. 2003), adjacent and downstream landowners intervened in an enforcement action brought by Division of Environmental Protection (DEP) against a waste water treatment facility for the release of untreated sewerage into the Indian Creek Fork. The Circuit Court granted summary judgment to the owner and operator of the treatment facility citing issues of statute of limitations and landowners' failure to demonstrate actions grounded in trespass or private nuisance. *Id.* at 201. The West Virginia Supreme Court of Appeals overturned the Circuit Court's ruling noting, in part, that "[w]hile Appellees argue that the Balls cannot demonstrate

trespass as a matter of law based on their failure to show that effluents actually invaded their property, rather than just the property of the State, this too should be a factual determination left for the jury's determination." *Id.* at 208.

Similarly, in the instant matter, with reference to the facts presented above and the arguments made thereto, genuine issues of material facts abound to support the Hagys' contention that BJ Services' caused harmful materials to physically invade the Hagys' property. Thus, summary judgment with respect to the Hagys' trespass claim is clearly inappropriate.

> ### 3. Genuine Issues of Material Facts Exist Regarding Whether the Hagys' Claims Against EQT Were Extinguished by Releases; Thus, Summary Judgment is Not Appropriate.

Contrary to the district court's erroneous determination, genuine issues of material fact absolutely exist to support the Hagys' contention that EQT fraudulently obtained exculpatory releases.

> #### a. Based on documented assurances made by EQT personnel, Dennis and Tamera Hagy's claims have NOT been released.

EQT moved for summary judgment based on the argument that all claims of Dennis and Tamera Hagy have been released for due consideration paid by EQT by way of two releases dated October 22, 2007 and April 23, 2008. The district court agreed with EQT's assertion and granted summary judgment. (JA p. 2385)

EQT landman, Jeremy White, verbally assured the Dennis Hagy that the subject releases ***do not*** cover damages as a result of contamination to groundwater. This assurance is documented in the recorded conversation between Mr. White and Dennis Hagy.

On or about February 3, 2009, Mr. Hagy called Mr. White to request, once again, that EQT bring water to the Hagy home.  (JA. p. 1478, *Conversation Audiotape Transcript)* Mr. Hagy inquired about a "list of chemicals" Mr. White had promised to bring him.  (JA. p. 1479, *Conversation Audiotape Transcript)* However, Mr. White advised that, given that Mr. Hagy had hired an attorney, Mr. White was cautioned to cease sharing any information with Mr. Hagy.  (JA. p. 1479, *Conversation Audiotape Transcript)*

At that point, Mr. Hagy confronted Mr. White regarding a fraudulently obtained release.

Mr. Hagy:    Well, you know, you lied to me on everything.

Mr. White:   No, I haven't lied to you about anything.

Mr. Hagy:    Yes, you did.

Mr. White:   What'd I lie to you about?

Mr. Hagy:    You sat right there and told me that that paper was about that property only.  Are you saying you didn't say that?

Mr. White:   The property only?

Mr. Hagy:    The property you stole when I come back on.

23

Mr. White:   They property –

**Mr. Hagy:    The extra property you took when they was drilling for your extra pit.**

**Mr. White:  Right.**

**Mr. Hagy:   That's what you said.**

**Mr. White:  Right.**

Mr. Hagy:   Well, they sent my attorney a letter and said that ain't right, so you lied.

Mr. White:  Ok.  Well, I mean I can't discuss this with you now.  I mean I got to discuss it with the attorney or our attorney.

(JA. p. 1480-1481, *Conversation Audiotape Transcript*).

The above exchange strongly suggests Mr. White recognized that he agreed with Mr. Hagy's representation that Mr. White had previously represented that the subject release had a limited purpose - one which did not cover contamination of Mr. Hagy's water.  In the very least, this recorded exchange presents a genuine issue of material fact with respect to the scope of the release as it was presented from Mr. White to Mr. Hagy and whether the release was obtained by fraudulent means.  In the final analysis, it is appropriate for a jury to weigh the credibility of Mr. White versus Mr. Hagy with respect to the representations made attendant to the subject releases.  What is clear at this point is that genuine issues of fact exist to suggest that the releases were obtained by fraud.

Guided by applicable jurisprudence, this Court should consider Mr. White's verbal representation as an important element in determining the contemplation of the parties relative to the subject releases. For example, in *Vaughn v. Didizian*, 648 A.2d 38 (Pa. Super. Ct. 1994), the trial court was deemed in error when it interpreted a release solely by construing the ordinary meaning of the language used the release but without considering what matters were within the contemplation of the parties. It was further held that a court cannot merely read a release, but it must also interpret the release so as to discharge only those rights intended to be relinquished. *Id*.

Furthermore, in *Frusetta v. Hauben*, 217 Cal. App. 3d 551 (*mod on other gnds*) (Cal. App. 2nd Dist. 1990), the trial court erroneously granted summary judgment in favor of the defendant owner and driver of a vehicle that collided with the plaintiff's vehicle, notwithstanding that the plaintiff had endorsed a check issued by the vehicle owner's insurance company which contained a full release of all further claims. The plaintiff submitted a declaration to the court that the she had discussions with a woman who identified herself as an adjuster from the insurance company, and the adjuster assured the plaintiff that she would receive a check in the amount of $250 as partial payment for her injuries. The declaration stated that the adjuster claimed that plaintiffs could pay some of her current medical bills with the proceeds of the check, and the rest would be paid later. The

25

plaintiff further declared that she acted in reliance upon the statements of the adjuster, that she had no prior experience in making claims, and that she had not retained counsel nor been advised that she might do so. The declaration was sufficient to raise triable issues of fact as to whether the insurance company had engaged in misrepresentation and fraud in the factum, and as to whether the plaintiff's alleged misapprehension about the nature of the release was induced by the insurance company. *Id*.

Similarly, EQT engaged in misrepresentation and fraud by assuring the Hagys that the releases did not cover groundwater claims while clearly not intending to adhere to that representation. Thus, despite the language of the releases, the EQT's verbal representation to the Hagy's must be considered in order to fully characterize the parties' contractual intent with regard to the releases.

Moreover, prior to securing the Hagy's signature to the April 2008 release, EQT had full knowledge of the problems at the subject well site, yet EQT concealed this knowledge and fraudulently obtained the April 2008 release. Below are the numerous factual issues relating to the drilling and completion of EQT's well on the Hagy property which the Defendants would have been privy and chose to conceal from the Hagys when EQT was attempting to secure Mr. Hagy's signature on a release for damage to the surface caused by their taking of more land for another pit.

26

- Inconsistent cement density.  (JA p. 1687-1688, *Luckey Depo at 72/8-73/7*)

- Lost pressure on cement pump. (JA p. 1691-1692*, Luckey Depo at 74/18-75/10)*

- EQT unsatisfied with the cement density.  (JA p. 1695, *Luckey Depo* at 77/5)

- Poor cement density.  (JA p.1698, *Luckey Depo at 78/6-78/11*)

- Cement retainer leaking at threads.  (JA p.1701,  *Luckey Depo at 80/13*)

- Concludes problem with the cement pump. (JA p.1704, *Luckey Depo* at 83/21).

- No cement bonding log.  (JA p.1707, *Luckey Depo at 85/10*)

- Pressure did not hold at annulus. (JA p.1710, *Luckey Depo at 88/11-19*)

- Partial setting of packer. (JA p.1713, *Luckey Depo at 89/4*)

- Cement charts "look noisy." (JA p.1716, *Luckey Depo at 92/3*)

- Water was pumped ahead of cement but "got none back."  (JA p.1716, *Luckey Depo at 92/22*)

- Could not hold pressure.  (JA p.1719, *Luckey Depo at 108/21-110/24*)

- Marcellus is finicky.  (JA p.1724, *Luckey Depo at 114/18*).

- Hagy site was an early Marcellus well. (JA p.1727, *Luckey Depo at 116/5*)

Hagy site was around the time of the first Marcellus wells.  (JA p.1730, Luckey Depo at 117/9)As a necessary result, genuine issues of material fact abound regarding the validity of the subject releases which preclude the granting of summary judgment.

## **CONCLUSION**

Appellants have demonstrated, without equivocation, that genuine issues of material fact abound with respect to their claims against BJ Services sounding in negligence and trespass.  Thus, the district court's findings and order granting summary judgment in BJ Services' favor was inappropriate and should be overturned.  Similarly, Appellants have also sufficiently demonstrated that genuine issues of material fact exist with respect to Appellants' contention that exculpatory releases cited by EQT were obtained fraudulently.  Thus, the district court's findings and order granting summary judgment in EQT's favor was also inappropriate and should likewise be overturned.  Appellants have carried their burden to defeat summary judgment and are entitled to present their case, replete with genuine issues of material fact, before a jury charged with the task of making weighing the facts and making credibility determinations.

## **REQUEST FOR ORAL ARGUMENT**

Appellants request oral argument.

## **SIGNATURE OF COUNSEL**

I, Kevin W. Thompson, do hereby respectfully submit this opening brief on the Fifth Day of November, 2012.

/s/ Kevin W. Thompson
Kevin W. Thompson (W.Va. Bar 5062)
David R. Barney, Jr.
THOMPSON BARNEY
2030 Kanawha Boulevard, East
Charleston, West Virginia 25311

*Counsel for Plaintiffs/Appellants*

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

      this brief contains 6,089 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

      this brief has been prepared in a proportional spaced typeface using Word Perfect in 14 point Times New Roman.

                              /s/ Kevin W. Thompson
                              Kevin W. Thompson (W.Va. Bar 5062)

Dated:  November 5, 2012

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on November 5, 2012, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Niall Paul, Esquire
Nathan Atkinson, Esquire
Spillman Thomas
300 Kanawha Boulevard
Charleston, West Virginia 25301
*Counsel for BJ Services, USA*

John Barr, Esquire
Bracewell & Guiliani
711 Louisiana, Suite 2300
East Houston, Texas 77002
*Counsel for BJ Services, USA*

Timothy M. Miller, Esquire
Benjamin W. Price, Esquire
Robinson & McElwee,
700 Virginia Street, East
Charleston, West Virginia 25326
*Counsel for Equitable Production Co.*

The necessary filing and service were performed in accordance with the instructions given to me by counsel in this case.

/s/ Melissa A. Dockery
Melissa A. Dockery
GIBSON MOORE APPELLATE SERVICES
421 East Franklin Street
Suite 230
Richmond, VA 23219